**United States District Court**
**For the District of Maine**

United States of America

　　　　　　　　　　　　　　**Case Nos. 1:21-cr-00029-LEW**

v.　　　　　　　　　　　　　　　**1:11-cr-00077-DBH**

Donald Turner

**Defendant's Memorandum in Aid of Sentencing**

Through counsel, Donald Turner respectfully requests that this Court impose a sentence of:

(1)　**180 months' prison**, followed by **5 years of supervised release**, for robbing a bank and for possessing firearm as a prohibited person; and

(2)　**12 months' prison,** followed by **18 months of supervised release** for violating the conditions of his supervised release;

(3)　and that it order the these sentences to be served **concurrently**.

**I.　　The legal framework**

**A.　　The applicable advisory Guidelines range**

A district court should begin all sentencing proceedings by correctly calculating the applicable advisory Guidelines range. *See Gall v. United States*, 552 U.S. 38, 49 (2007) (so stating); *United States v. Booker*, 543

U.S. 220, 246 (2005) (A sentencing court considers the Guidelines range, but ultimately tailors the sentence in light of, *inter alia*, the statutory concerns outlined in 18 U.S.C. § 3553(a)). "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall*, 552 U.S. at 49.

### i.    Case number 1:21-cr-029

Don understands, and does not object to, Probation's decision to treat the charges of bank robbery (Count 1) and possession of a firearm by a prohibited person (Count 2) as separate groups, respectively.  (PSR ¶¶ 18-34.)[1]  Regarding Count 1 (Group 1), Don renews his objection to a two-level increase to the base offense level pursuant to USSG § 2B3.1(b)(2)(F).  (PSR ¶ 25; Dkt. # 66 (Turner's PSR Objections), ¶ 9).  If this Court agrees, then the adjusted offense level for the bank robbery charge would be 22.   However, because Don does not challenge the adjusted offense level calculation for Count 2 (Group 2), or the application of USSG § 3D1.4, he understands that the combined adjusted offense level is 26.

---

[1]    Throughout, "PSR" refers to the Revised Presentence Investigation Report, Dkt. # 67.  In this subsection, "Dkt." refers to the docket entries in case number 1:21-cr-029.

Don understands, and does not object to, a Chapter Four enhancement, except that he disagrees, as a matter of law, that his conviction for criminal threatening with a dangerous weapon in violation of 17-A M.R.S. § 209 and 17-A M.R.S. § 1604(5) qualifies as a crime of violence for purposes of both the career offender and armed career criminal enhancement.  (PSR ¶ 46; Dkt. # 66, ¶ 14).  However, because the government can establish career-offender and armed-career-criminal status based on his prior convictions for bank robbery, he understands that the adjusted offenses level after application of the Chapter Four enhancement is 33.[2]

Don likewise understands that his criminal history computation nets a Category VI, resulting in a Guidelines range of 168 to 210 months' imprisonment, which is changed to 180 to 210 months' imprisonment by application of USSG § 5G1.2(b).  (PSR ¶ 79).  By operation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(e)(1), the minimum term of imprisonment must be 15 years.  (PSR ¶ 78).

---

[2]    Don's objections are not superfluous.  A federal sentence is like a house of bricks.  If any one of the bricks is defective, the longevity of the entire structure is threatened.

This provides necessary context to Don's sentencing recommendation: 180 months' prison. Don additionally asks this Court to impose an aggregate five-year term of supervised release, the maximum allowable by USSG § 5D1.2(a)(1) and 18 U.S.C. § 3583(b)(1)). PSR ¶ 81.

Don's proposed within-Guidelines sentence is presumptively reasonable. *See e.g. Rita v. United States*, 551 U.S. 338, 347 (2007) ("[T]he presumption reflects the fact that, by the time an appeals court is considering a within-Guidelines sentence on review, *both* the sentencing judge and the Sentencing Commission will have reached the *same* conclusion as to the proper sentence in the particular case. That double determination significantly increases the likelihood that the sentence is a reasonable one.") (Emphasis in *Rita*). Moreover, Don's sentencing proposal accords with the so-called appeal waiver, which is capped at 180 months' imprisonment. Dkt. # 51, p. 3.

### ii.    Case number 1:11-cr-077

On November 30, 2011, Don was sentenced to 72 months' prison and 36 months' supervised release, following a guilty plea to the Class C felony of bank robbery in violation of 18 U.S.C. § 2113(a). (PSR ¶ 47). On

November 12, 2019, this Court accepted Don's admission that he violated the conditions of supervised release and sentenced him to six months' prison followed by 36 months' supervised release.  (PSR ¶ 47).   On September 4, 2020, Probation alleged three Grade C violations of supervised release and recommended revocation.   (Dkt. # 44).[3]   On November 2, 2022, Don pleaded guilty to the offenses alleged in case number 1:21-cr-029.  (PSR ¶ 2).  On December 19, 2022, Probation filed an amended petition, which additionally alleged the Grade A violation of new criminal activity: the offenses alleged in case number 1:21-cr-029, and again it recommended revocation.  (Dkt. # 75).

Don agrees with Probation that by operation of 18 U.S.C. §§ 3583(b)(2), (e)(3), (h), the maximum allowable revocation sanction for Don (because he was convicted of a Class C offense and because he previously served a 6-month carceral revocation sentence) is 24 months' prison and 30 months' supervised release.   (Dkt. # 76 (Revocation Report), p. 4 (so stating)).  Given Don's criminal history category of IV, the Guidelines range for a Grade C violation is 6-12 months'

---

[3]    In this subsection, "Dkt." refers to the docket entries in case number 1:11-cr-077.

imprisonment, and the Guidelines range for a Grade A violation is 24-30 months' imprisonment, USSG § 7B1.4(a), but that must default to the statutory maximum penalty of 24 months' prison, USSG § 7B1.4(3)(A). (Dkt. # 76, p. 5).

Don will freely admit the Grade C violations.  Don cannot deny the Grade A violation without breaching the terms of his Plea Agreement or placing his acceptance-of-responsibility adjustment in case number 1:21-cr-029 in jeopardy.  He objects to the timing of the amended revocation petition, as explained in greater detail *infra*.

As before, this provides necessary context to Don's sentencing recommendation of 12 months' prison, a sentence at the top of the Guidelines range for a Grade C violation, followed by 18 months' supervised release, which is the maximum allowable by law in his case. *See* U.S.S.G. § 7B1.4(a). This within-Guidelines sentencing recommendation is presumptively reasonable. *See Rita, supra* at p. 4.

### iii.   Concurrent sentencing

The policy statement in USSG § 5G1.3(d) acknowledges that a sentencing court has the authority to impose concurrent sentences.  It provides:

> In any...case involving an undischarged term of imprisonment, the sentence for the instant offense may be imposed to run concurrently, partially concurrently, or consecutively to the prior undischarged term of imprisonment to achieve a reasonable punishment for the instant offense.

Commentary Application Note (4)(C) clarifies that the above-quoted language in subsection (d) "applies in cases in which the defendant was on federal...supervised release at the time of the instant offense and has had such...supervised release revoked."

To be sure, the Application Note cross-references the policy statement in USSG § 7B1.3(f) and adds that "the Commission recommends that the sentence for the instant offense be imposed consecutively to the sentence imposed for the revocation." And the policy statement in USSG § 7B1.3(f) similarly states:

> Any term of imprisonment imposed upon the revocation of...supervised release shall be ordered to be served consecutively to any sentence of imprisonment that the defendant is serving, whether or not the sentence of imprisonment being served resulted from the conduct that is the basis of the revocation of...supervised release.

But of course, the Commission's position, embodied in policy statements, is not binding on this Court. *See e.g. United States v. Henderson*, 64 F.4th 111, 119 (3d Cir. 2023) (Discussing the state of the law with respect to Guidelines Commentary after the Supreme Court

overruled *Stinson v. United States*, 508 U.S. 36 (1993) in *Kisor v. Wilkie*, 139 S.Ct. 2400 (2019)); *see also e.g. Beckles v United States*, 580 U.S. 256, 265 (2017) (Post-*Booker*, "[t]he Guidelines…continue to guide district courts in exercising their discretion by serving as the framework for sentencing, but they do not constrain that discretion.") (internal citations omitted).

The First Circuit has repeatedly emphasized that district courts have discretionary authority to impose concurrent sentences. A district court enjoys "wide latitude" in determining whether sentences should run consecutively or concurrently. *United States v. Santa-Soler*, 985 F.3d 93, 99 n. 5 (1st Cir. 2021) (citing 18 U.S.C. § 3584 and *United States v. Ocasio-Cancel*, 727 F.3d 85, 99 (1st Cir. 2013) ("[T]he decision about whether to impose a concurrent or consecutive sentence normally lies within the district court's discretion.")). For the reasons discussed herein, Don respectfully requests that this Court order him to serve the revocation sentence concurrently with the sentence imposed on Counts 1 and 2 in case number 1:21-cr-029.

## B.     The importance of individualized sentencing

Although the Guidelines remain "the starting point, and the initial benchmark, *Gall*, 552 U.S. at 49-50, "a sentencing court may no longer rely exclusively on the Guidelines range; rather, the court must make an individualized assessment based on the facts presented and other statutory factors." *Beckles*, 580 U.S. at 265 (cleaned up).  Individualized assessments are the hallmark of federal sentencing:

> It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue.

*Koon v. United States*, 518 U.S. 81, 113 (1996).

A court is guided in its individualized sentencing determination through the application of the case- and offender-specific criteria outlined in 18 U.S.C. § 3553(a), and in its solicitude to the Supreme Court's unwavering recognition of the importance of mitigating evidence.  For example, in *Penry v. Lynaugh*, 492 U.S. 302 (1989), the Court explained that:

> [E]vidence about the defendant's background and character is relevant because of the belief, long held by this society, that

> defendants who commit criminal acts that are attributable to
> a disadvantaged background…may be less culpable than
> defendants who have no such excuse.

*Id.* at 319; *see also e.g. Payne v. Tennessee*, 501 U.S. 808, 822 (1991) (A sentencer may consider "any relevant mitigating evidence that the defendant proffers in support of a sentence less than death.").

## II.   Application

### A.   The history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1): Don's horrific childhood, untreated mental illness, and lifelong struggle with substance use disorder.

The ghastly nature of Don's childhood is well-documented.  In his "early developmental years," his home life was "chaotic, mainly due to [his] father's active alcoholism and physical abuse and threats of violence to self and family." (Exh. 2, p. 1).  According to Don's sister Nicole, Don's father "was an abusive alcoholic when we grew up." (Tr. 16).[4]  Nicole explained:

> We had the neighbor come over and take railroad ties and put
> them into the frames of our door because [Don's father] would
> break the front door down when were little kids.  6 – 5, 6, 7

---

[4]    The "Tr." citation refers to the transcript of the sentencing proceedings held on November 30, 2011 in case number 1:11-cr-077.

> years old I was calling the police on my dad. …. That's how we
> grew up – with an alcoholic in our house, my dad breaking
> beer bottles over my mother's head.

(Tr. 16-17). This terrifying, violent behavior continued until Don's mother filed for divorce (for the second time) in 1979, when Don was about 7 years old. (Exh. 1, p. 1).

When Don was 5 years old, he was sexually abused by his uncle. (PSR ¶ 68; Exh. 1, p. 2). Don told his mother about the abuse, but she dismissed his claims and continued to leave him in the care of this uncle. (PSR ¶ 68). When Don was 7 or 8 years old, he was sexually abused by his mother's boyfriend for about six months. (PSR ¶ 68).

From a very young age, Don's mental health was a concern. On October 5, 1979, a clinical social worker at Eastern Maine Medical Center noted that Don's "behavior in school has escalated" and she recommended that Don participate in "group therapy to work through his feelings of confusion and anger regarding other family members and his perceived role in parent's [sic] divorce." (Exh. 3, p. 1). On October 11, 1979, Don was evaluated by a physician at Eastern Maine Medical Center who suggested a diagnosis of "anxiety neurosis (300.0 DSM-II)." (Exh. 1, p. 2, 21). Don was 8 years old.

Don's father moved out-of-state after the divorce and ostensibly abandoned his family. *See e.g.* PSR ¶ 56. Records suggest that Don continued to participate on a regular, frequent basis, in either family or group therapy or individual psychotherapy (or at times, a combination) at the Eastern Maine Medical Center from 1979 until at least 1983, when Don would have been about 11 and a half years old.[5]

When Don was 14 years old, staff at Brewer High School listed many positive things about Don:

> Makes friends easily; plays trumpet; participates in chorus; controls temper better; has improved in obeying rules; does laundry; does chores better; ability to earn money; ability to make good grades; neat appearing good looking; helpful.

(Exh. 4, p. 2 (added punctuation)). Teachers also observed that Don was motivated by the same things as most teenagers: "music, girls, telephone, activities, sweets, brownies, cookies, ice cream, pancakes, soda, money – always helps." *Id.*

---

[5]     These records are extensive. Counsel will gladly provide them upon request.

But Don's life took a sharp turn for the worst when he was 15, and this set him on a trajectory that would, unfortunately, come to define his adulthood.  Don pauses here to makes three points.

*One,* with the benefit of recent scientific advancements, we now know something that the adults in Don's life did not know at the time: just as his interest in music and girls was typical teenage behavior, so, too, was his increasingly defiant behavior and his experimentation with drugs and alcohol; these common attributes of an immature brain are due to physiological factors beyond the child's control.  *See e.g. Roper v. Simmons*, 543 U.S. 551, 569 (2005) (Developments in psychological and brain science show that transient rashness, proclivity for risk, and an inability to assess consequences are common in teenagers and the product of an underdeveloped adolescent brain.).

*Two,* it is, perhaps, also easier to see in hindsight that, given Don's father's alcoholism, experimentation with drugs and alcohol might be far riskier for Don than others – eventually, that proved to be true.  *See e.g. Traynor v. Turnage*, 485 U.S. 353, 563-64 (1988) (Blackmun, J., concurring in part and dissenting in part) (citing studies regarding generational alcoholism).

*Three*, we now know that Don has several significant mental health diagnoses which, together with a developing adolescent brain and a history of family abuse (substance abuse, physical abuse, sexual abuse) may have served either as a catalyst or fuel (or both) for continued self-destructive tendencies.

After joyriding in his mother's boyfriend's car – for which he was placed on probation and ordered to complete community service – Don's mother asked a clinical psychologist for an evaluation. (Exh. 5, p. 1). On April 7, 1986 (when Don was about 14 years old), the psychologist reported: "Donald's Rorscach protocol describes an adolescent who has difficulty responding, in a comfortable way, to resolve feelings." *Id.* at 1. He provided a diagnosis of "under-socialized, non-aggressive conduct disorder (3.12.10 DMS-III)." (Exh. 1, p. 2, 22).

Several months later, on March 16, 1987 (when Don was 15 years old), his mother voluntarily petitioned the Department of Human Services (DHS) to remove him from her home (and she did not request a kinship placement). (Exh. 6, p. 1). Don was placed at Atrium house. (Exh. 7. By the time he arrived there, Don had already begun experimenting the drugs and alcohol. (Exh. 6, p. 1; Exh. 1, p. 2). On June

11, 1987, the Director of Project Atrium wrote: "Don has a history of drug and alcohol use, although dependency was not a problem during his stay here. The risk for Don being a substance abuser is high…as an Adult Child of an Alcoholic." (Exh. 7, p. 1).

Three days after being kicked out of his mother's home and arriving at Atrium House, on February 21, 1987, Don ran away. (Exh. 7, p. 1). He returned, "but this was the first in a series of oppositional behaviors from Don." *Id.* Ironically, the Director of Project Atrium simultaneously recognized that Don chaffed at the structured requirements of the group home while recommending that Don "is going to need a more restrictive environment." *Id.*

After running away for a final time and spending the night at a homeless shelter, on March 17, 1987, Don was discharged from Atrium House. *Id.* In other words, after the highly traumatic event of being removed – at his mother's request – from his mother's home, Don was given less than a month to adjust before he was also removed from Atrium House.

On June 13, 1987, a social worker with Maine Occupational Medicine, who had worked with Don for months, reported that Don was

now "chemically addicted to both drugs and alcohol." (Exh. 1, p. 25). She diagnosed Don with "Conduct Disorder, socialized and non-aggressive" and she predicted that "[w]ithout sobriety, none of Don's other problems can be addressed." *Id.* at 25-26. She "strongly recommended" that Don be sent to "a locked unit" for rehabilitation." *Id.* at 26. Otherwise, she warned, Don was "highly likely to self-medicate with chemicals in order to cope with his behavioral problems." *Id.*

On November 5, 1987, just days before Don's sixteenth birthday, Don's DHS case worker outlined the tumultuous events that occurred in Don's life since his mother relinquished custody. (Exh. 1, p. 30-36). It paints the unfortunate picture of a child shuttled from one placement to the next because of behavioral programs, even though it doesn't appear that anyone gave Don sufficient time to adjust to the reality of being away from his mother while suffering from substance use disorder:

> Don was placed at Atrium House when he first came into custody of DHS. Don was asked to leave Atrium as he left Atrium, got drunk, returned to Atrium, and was verbally abusive to the staff. Donald was placed in the foster home of Christine Thurston but did not want to follow the rules of that home and did not want to attend school. Donald ran away and placed himself with a family friend, Diane Keheller.

Donald stayed with Diane from may until the middle of June. Don then left and got his own apartment and moved around with different friends for a period of time. Don was placed in Halcyon House from September 9th to September 14th. Don left Halcyon as he did not want to follow the rules. Don then stayed at New Beginnings for almost a week before he left. On September 22nd, Donald entered the substance abuse program at Eastern Maine Medical Center. Don successfully completed this program and returned to his mother 10/22/87.

(Exh. 1, p. 30). Somehow, throughout this ordeal, Don, who was a freshman in high school, managed to take "some sophomore credits." *Id.* at 33.

Just a few months later, in May 1998, Don was detained by court order at the Maine Youth Center and placed in a housing unit for children suffering from drug or alcohol abuse. (Exh. 8, p. 1-2).

In the fall of 1998, around his eighteenth birthday, Don participated in Hurricane Island Outward Bound School, and the report that he received from his instructors describes a young man desperate to overcome his internal struggle to control and appropriately express anger and frustration. (Exh. 9). The instructors wrote to Don to say: "You

expressed many times the desire to commit to change, to avoid the pitfalls that have trapped you before and to 'straighten your life out.'" *Id.* at 2.

Don's adulthood has been marred by his fight to overcome his substance use disorder. His successes match his failures. There are high points – such as his marriage to Lynn Dunphe; his enduring friendship with Kelly Berube (*see* Exh. 11); his children; his strong work ethic (*see* Exh. 1, p. 37-41; Exh. 12); and stretches of sobriety (most notably when Don was in his twenties) – and there are failures, including significant stints in prison for very serious crimes.

The unifying theme to all of it is, as we can now see more clearly through the passage of time and advances in psychological care, Don's untreated (or to be more charitable, seriously under-treated) bi-polar disorder, depression, and post-traumatic stress disorder, and what is almost certainly related to that: his addiction to drugs. As Terry Fralich explains in careful detail and after several sessions with Don, significant adverse childhood experiences reverberate still today. (Exh. 1, p. 3-9). And this, of course, has nothing to do with a simple lack of willpower to thwart his trauma and chemical dependencies. Don has the desire to change in spades, and he has since he was a child.

Just before his 29th birthday, in October 2000, Don attempted suicide. PSR ¶ 64. When he was 31 years old, in May 2003, Don attempted suicide again. *Id.* A year later, Don attempted suicide a third time. *Id.*

Don has attempted to confront his demons. In the fall of 2003, Don again returned to Eastern Maine Medical Center for group therapy to address his substance use disorder. PSR ¶ 65. At times, he was belligerent with staff and he was eventually discharged. *Id.* Don told his physician that he suspected he suffered from bipolar disorder, but this diagnosis was never confirmed (nor was he diagnosed with depression, despite his known suicide attempts or post-traumatic stress disorder despite his childhood trauma). *Id.*

Don's criminal history, from around his early thirties, illustrates his plight. In 2004, when Don was 32 years old, he stole from his employer in order to pay for his drug habit and then he made things worse by consuming drugs and therefore violating his probation. (PSR ¶ 44). He went to Serenity House, but then left. *Id.* He went to Foundation House, but then left. *Id.* This, of course, harkens to Dan's experience at Atrium house. Sober living facilities were ineffective for Don because –

at least to this point in Don's life – his underlying trauma and the mental health issues that motivated his substance use disorder had not been seriously addressed.

Two years later, when he was 34 years old, Don received his first significant prison sentence (60 months in BOP custody) for two bank robberies. (PSR ¶ 45). Don stole about $2,000 and $4,000, seriatim, to feed his addiction and to pay off his drug debt. *Id.* Don robbed another bank when he was 39 years old. (PSR ¶ 47). He made off with a little over $3,000. *Id.*

These events could have been – they should have been – inflection points in Don's life. But the federal prison experience is designed to be punitive, not rehabilitative, and thus, Don's time in prison did not cure his mental illness or purge him of his struggle with addiction. *See e.g.* 18 U.S.C. § 3582(a) (A sentencing judge shall recognize that imprisonment is not appropriate to promote rehabilitation when the court considers the §3553(a) factors); *Tapia v. United States*, 564 U.S. 319, 330 (2011) (Noting that historically, "[w]hen Congress wanted sentencing courts to take account of rehabilitative needs, it gave courts the authority to direct appropriate treatment for offenders" but that now, there is no "provision

granting courts the power to ensure that offenders participate in prison rehabilitative programs" thus "illuminating" and underscoring that rehabilitation is not consonant with a federal prison term.).   Especially frustrating is the fact that Don never participated in the BOP's residential drug abuse program (RDAP) because his crimes of convictions did not obviously involve drugs.

In 2004, when he was about 32 years old, Don was finally diagnosed with bi-polar disorder.  (PSR ¶ 63).  While in BOP custody, in May of 2010, his bi-polar disorder diagnosis was confirmed, and he was prescribed Zyprexa and Wellbutrin and records indicate that it was very effective.  *Id.*  The problem is, Don had no way to afford that medication, to which he had become dependent, when he was released from prison. When he was released in September 2010, he was given only a 30-day supply of the medications.  Probation directed Don to a local clinic, where his Wellbutrin was continued and he received free samples of Zyprexa. *Id.*  This lasted until about mid-February 2011, when Don learned that the clinic ran out of free samples of Zyprexa.  *See e.g.* Tr. 8-9.[6]  Obviously,

---

[6]   The "Tr." citation refers to the transcript of the sentencing proceedings held on November 30, 2011 in case number 1:11-cr-077.

stopping this serious medication cold turkey was contraindicated.  Soon after, Don relapsed and committed a bank robbery.  Tr. 10-11.

Don was released from prison on March 30, 2020, right at the time when our national fear and uncertainty about the coronavirus was at its peak.  Don was deemed essential personnel and his job duties as a plumber placed him direct contact with the bodily fluids of others, which understandably caused him to worry greatly about his own health and that of his loved ones, specifically Kelly Berube and her elderly parents, with whom he had daily contact.  *See e.g.* PSR ¶ 75.  The anxiety for him was overwhelming.[7]  It proved to be a trigger for his substance use disorder.  Don had difficulty bonding with his assigned counselor at the time because his sessions were not confidential, although he did self-report lapses in sobriety in the hope of getting help.

On August 31, 2020, while Don was on supervision, he became suicidal again, and he shared that with his probation officer.  (Exh. 10).

---

[7]     Don was not alone in this regard.  We are only beginning to understand how the pandemic compromised mental health (and led to a rise in anxiety disorders) and exacerbated substance abuse.  *See e.g.* Panchal, Nirmita et al., The Implications of COVID-19 for Mental Health and Substance Use, published by the Kaiseer Family Foundation, March 20, 2023, available at: https://www.kff.org/coronavirus-covid-19/issue-brief/the-implications-of-covid-19-for-mental-health-and-substance-use/.

The probation officer's response was shocking and disappointing. Instead of offering meaningful help to Don, the probation officer responded by text message:

- "Please just don't hurt anyone else in the process, Don." *Id.* at 1.

- "Doesn't have to go that way, but you know that. My phone's on if you choose to call. I'm not going to chase you. You're a smart enough guy, you know you have options. Hope you make the best choices for you. Hope to see you again (upright and alive). Be well." *Id.* at 1.

- "Anyways, if you want to come in, or meet somewhere safe, let me know. If not, I respect that too. I was rooting for you, Don. Thought we had a shot this time." *Id.* at 2.

- "Also – the Jeep? Please don't hurt Kelly financially too. Try to make sure she can get that thing back." *Id.* at 2.

- Okay, thanks for reaching out this morning, Don. I do appreciate it. Again, hope you decide to try to get well. Felt like you were close." *Id.* at 3.

The full exchange is attached at Exhibit 10. Phone records confirm that Don's probation officer never actually placed a call to Don. This is the antithesis of meaningful supervision.

And so, the $64,000 question: how does a Court measure the character of a man who was sexually abused by two men; who sought protection from the abuse from his mother and was rebuffed; who witnessed serious domestic violence directed at his mother; and who was abandoned by his father, all before his tenth birthday?  How does a Court measure the character of a man who likely inherited from his father addictive tendencies; who became chemically dependent on controlled substances while his brain was still underdeveloped; and who was disowned by his mother and forced to live with strangers, all before his fifteenth birthday?  What should a Court make of the fact that numerous attempts at sobriety and rehabilitation have failed due to, *inter alia*, Don's belligerence, which in hindsight seems a likely marker for his mental health issues?  Are Don's repeated suicide attempts a signal that Don himself mourns for what his life has become, and that he, most of all, wishes for change?

Without question, all of it is unambiguously tragic, and Don would be manifestly entitled to empathy and pity, except that, along the way, he, too, has harmed others.  Don is the first to acknowledge his failings as a husband and a father.  And he is deeply remorseful that he has

caused multiple bank tellers to fear for their lives.  He understands that his victims have sought out therapy and that the pain he caused them still lingers.  Don is embarrassed and ashamed that his selfish drive to consume drugs altered the lives of people who never deserved that.

**B.      The nature and circumstances of the offense, 18 U.S.C. § 3553(a)(1): Don did not possess a weapon inside the bank and the weapon he did possess was inoperable.**

The crime of bank robbery, 18 U.S.C. § 2113, contemplates the taking, by force or intimidation, of any money or property in the custody of any bank.  It goes without saying that this is a manifestly serious offense, regardless of how it is committed.  That said, the statute is quite broad and it encompasses a multitude of factual situations ranging from, at one end of the continuum, theft of money from an automatic teller machine, and at the other end, a stick-up at a bank branch and taking money by physical force (certainly, it could get worse still, *see e.g.* 18 U.S.C. § 1203, which contemplates hostage taking).  Although in either scenario the victim is, technically, the financial institution; in a truer sense, in most cases (and certainly, in Don's case) the victim is really the bank teller who was subject to the force or intimidation.  The goal here is

not to minimize Don's culpability, but rather, to place it in context.[8]  Don

entered the bank, passed a note to the teller, and received around $1,300

in return.  Fortunately, he did not have a weapon with him at the time.

Of course, the constitutionality of 18 U.S.C. § 922(g)(1) has come

under increasing scrutiny after *New York State Rifle Pistol Assn., Inc. v.*

*Bruen*, 142 S.Ct. 2111 (2022).  *See e.g. Range v. Attorney General United*

*States*, 53 F.4th 262 (3d Cir. 2022), *rehearing en banc granted, vacated by*

*Range v. Attorney General United States*, 56 F.4th 992 (2023) (upholding

the constitutionality of § 922(g)(1)).  Notwithstanding Don's guilty plea,

this Court may and should declare 18 U.S.C. § 922(g)(1) unconstitutional

for all of the reasons advanced by the defense and its amici in *Range*.  *See*

*Range*, 53 F.4th at 283-85; *see also Class v. United States*, 138 S.Ct. 798,

801-2 (2018) (A guilty plea does not bar a defendant from challenging the

---

[8]      Insofar as 18 U.S.C § 16 is concerned, the "nature of the offense"
refers to its categorical character.  *See Sessions v. Dimaya*, 138 S.Ct.
1204, 1217 (2018) ("An offense's 'nature' means its normal and
characteristic quality.") (internal citation omitted).  Don understands
that insofar as 18 U.S.C. § 3553(a) is concerned, "nature of the offense"
refers to the nature and circumstances of the defendant's precise conduct.
This understanding is based on a contextual reading of § 3553(a), and its
directive that this Court craft a sentence that is "sufficient, but not
greater than necessary" given case-specific facts.

constitutionality of the statue of conviction and a conditional guilty plea is not necessarily a prerequisite to the challenge.); *id.* at 804 (quoting *Commonwealth v. Hinds*, 101 Mass. 209, 210 (1869) ("The plea of guilty is, of course, a confession of all the facts charged in the indictment, and also of the evil intent imputed to the defendant. … But if the facts alleged and admitted do not constitute a crime…, the defendant is entitled to be discharged.")).

The salient point, and the one that matters for purposes of § 3553(a), is that although Don did possess a weapon and weapons possession by a prohibited person is concerning, the gun that Don had lacked a firing pin and was therefore incapable of firing a bullet.  Don acquired the gun to take his own life and quickly discovered that it lacked a firing pin.

**C.  The need for the sentence imposed to promote respect for the law, afford adequate deterrence, protect the public, and help the defendant, 18 U.S.C. §§ 3553(a)(2)(A)-(D): a lengthy carceral term is sufficient to achieve these goals.**

At sentencing, Don will be 51 years old.  The United States Sentencing Commission recently released its report titled, The Effects of

Aging on Recidivism Among Federal Offenders.[9]  One key finding of the Commission's study of federal offenders' recidivism by age at release was that:

> Age exerted a strong influence on recidivism across all sentence length categories.  Older offenders were less likely to recidivate after release than younger offenders who had served similar sentences, regardless of the length of the sentence imposed. …. *[A]mong all offenders sentenced to one year or more of imprisonment, there was no clear association between the length of sentence and the rearrest rate.*

*Id.* at 3 (emphasis added).

Don posits that his likelihood of *his* recidivism depends most significantly on whether he receives serious treatment for his substance use and bipolar disorders.  The pertinent question is whether a prison term in excess of 15 years will accomplish these goals – it will not.  Rehabilitation is not a penological goal; for another, drugs are readily

---

[9]    The report is available online here: https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2017/20171207_Recidivism-Age.pdf.

available in federal prisons;[10] and individualized mental health therapy and treatment is largely aspirational and highly dependent on where an inmate is housed.

This segues to perhaps the most important question in this case, which is how to adequately punish Don's violation of the conditions of his supervised release. He turns to that next and offers two arguments, one purely legal and the other factual.

### D.    Sentencing for Don's supervised release violation

This Court should not consider the Fourth Allegation as a basis for revoking Don's supervised release. Probation has known since September 10, 2020, that the FBI believed that Don robbed a Bangor Saving Bank branch in Bangor, Maine. (ECF 76, p. 3). But it waited over two years – and until after Don pleaded guilty to the bank robbery and weapons possession – to amend its Revocation Petition and allege for the first time, a Grade A violation of Mandatory Condition One, which prohibited Don from committing another federal crime. The timing of the amendment is constitutionally problematic.

---

[10]    *See* The Federal Bureau of Prisons' Drug Interdiction Activities, Report Number I-2003-002, available at: https://oig.justice.gov/reports/BOP/e0302/final.pdf.

1.    **The late amendment enables Probation to withhold discovery until after the guilty plea is entered.**

Probation has an obligation to provide discovery materials to the defense detailing the evidence it has in support of each alleged violation of supervised release.   *See* Fed. R. Crim. P. 32.1(b)(2)(B) (In the supervised release context, a defendant "is entitled to," the "disclosure of evidence against the person"); *United States v. Derewal*, 66 F.3d 52, 55 (3d Cir. 1995) (Due process and Fed. R. Crim. P. 32.1 require that a defendant receive "disclosure of the evidence against him."); *United States v. Tham*, 884 F.2d 1262, 1265 (9th Cir. 1989) (recognizing the same with regard to Rule 32.1); *United States v. Dixon*, 187 F. Supp. 2d 601, 603 (S.D.W.V. 2002) ("[T]he categories of information required by Rule 32.1 appear drawn directly from the Supreme Court's decision in *Morrisey v. Brewer*, 408 U.S. 471 (1972)); *see also United States v. Johnson*, 356 Fed. Appx. 785, 789 n. 1 (6th Cir. 2009) (Also, "[Fed. R. Crim. P.] 16 may apply by virtue of the fact that supervised-release hearings were not explicitly excluded by Rule 1(a)(5).").

Three things are additionally and axiomatically true.   *One*, insofar as new criminal activity is concerned, the breadth of information – incriminating or exculpatory – that Probation possesses may far exceed

that collected by the government.  Probation officers are likely to know a considerable amount about the supervisee's family dynamics and living situation, employment and financial history, friend group, his or her appearance and idiosyncratic proclivities, etc.  Any one of these things could be relevant and probative of guilt or innocence.

*Two*, Probation's discovery obligations are commensurate with the timing of the revocation hearing.  Nothing requires Probation to immediately disclose the incriminating or exculpatory evidence it amasses.  Rule 32.1(b)(2)(B) provides only that the court must hold a revocation hearing "within a reasonable time."  Assuming that Rule 16 applies to Probation, Probation's obligation is simply to provide discovery sufficiently before the hearing to provide a "fair opportunity" for the defendant to meet its evidence.  Fed. R. Crim. P. 16(a)(1)(B)(ii).

*Three*, while Probation has an obligation to provide discovery to the defendant, it has no express obligation to provide discovery to the government insofar as new criminal activity is concerned.  And the government's own discovery obligations do not require it to collect information from Probation. The government's disclosure obligations only extend to information "in its possession, custody, or control." *United*

*States v. Hall*, 434 F.3d 42, 55 (1st Cir. 2006).  This duty "does not extend to information possessed by government agents not working with the prosecution."  *United States v. Rivera-Rodriguez*, 617 F.3d 581, 595 (1st Cir. 2010) (quoting *Hall*, 434 F.3d at 55).  In *Rivera-Rodriguez*, the First Circuit found no *Brady* violation where incriminating evidence was "maintained by the probation officer preparing the PSR, and there [was] no evidence that the federal prosecutor or any agent working on the U.S. Attorney's behalf had this information prior to or during trial."  *Id.* at 595; *cf. United States v. Jimenez Martinez*, 83 F.3d 488, 496 (1st Cir. 1996) (For purposes of U.S.S.G. § 5C1.2, "the government" does not include a U.S. Probation Officer).

Probation has no duty to disclose to the government any of the information it possesses in advance of a plea hearing and the government's duty to disclose do not obligate it to collect from Probation any of the information it possesses in advance of a plea, either.  Probation will disseminate information to the government and to the defense in advance of the revocation hearing, but nothing requires it to do so before that.

Thus, by waiting to amend the Revocation Petition until after a criminal defendant has pleaded guilty to the criminal activity that forms the basis for a new-crimes violation, Probation can skirt its obligation to disclose any exculpatory information it may have that is pertinent to the charge. This is the antithesis of fair play, and it is anathema to the fairness requirements inherent in the Due Process Clause.

### 2. The late amendment deprives defendant of the opportunity to negotiate a complete resolution of the case.

Probation's late amendment deprived Don of the opportunity to plea bargain effectively. A defendant cannot negotiate – or even attempt to negotiate – a complete resolution of the case (the underlying criminal matter and any ancillary supervised release matters) if the Revocation Petition is permissibly amended after plea bargaining is complete and the defendant has pleaded guilty. To be sure, Probation would not have been a party to this agreement and at all times, this Court remains free to impose whatever sentence it chooses regardless of the agreement between the parties, but the parties' recommendation is by no means inconsequential.

The "negotiation of a plea bargain is a critical phase of litigation." *Padilla v. Kentucky*, 559 U.S. 356, 373 (2010). And while a defendant

has no right to receive a plea offer, "[t]he reality is that plea bargains have become…central to the administration of the criminal justice system[.]". *Missouri v. Frye*, 566 U.S. 134, 143 (2012). The unassailable truth is that, "[t]o a large extent…horse trading between the prosecutor and defense counsel determines who goes to jail and for how long. That is what plea bargaining is. It is not some adjunct to the criminal justice system; it *is* the criminal justice system." *Id.* at 144 (citing Scott Stuntz, *Plea Bargaining as Contract*, 101 Yale L. J. 1909, 1922 (1992)) (cleaned up; emphasis in *Frye*). The benefits of plea bargaining can inure to both the prosecution and the defendant. Plea bargaining has "[t]he potential to conserve valuable prosecutorial resources and for defendants to admit their crimes and receive more favorable terms at sentencing." *Id.* at 144.

In order for any of these benefits to be realized, however, Probation may not wait until after the process is over to act on information that it has known – in this case, *for years*. Doing so deprives both the defendant and the prosecution of the opportunity to negotiate a global resolution of the case, and it deprives the courts of the opportunity to conserve precious resources. A late amendment to the Revocation Petition also

deprives the defendant of the genuine opportunity to show contrition, which segues to his third point.

### 3. A defendant cannot exercise his right to contest the allegations in the Revocation Petition without undermining the guilty plea, the plea agreement, and the opportunity to receive a sentencing reduction for accepting responsibility.

Defendants have the right to contest revocation allegations. *See generally* Fed. R. Crim. P. 32.1. As a practical matter, however, a defendant cannot exercise his or her right to contest a new-criminal-activity allegation after a guilty plea without undermining the validity of guilty plea itself. The defendant cannot exercise his or her right to contest a new-criminal-activity allegation after a guilty plea without almost certainly violating the terms of any plea agreement, as well. And a defendant who exercises his or her right to contest a new-criminal-activity allegation after a guilty plea will risk losing acceptance-of-responsibility credit at sentencing. The late amendment has the effect of strong-arming a criminal defendant into admitting a Grade A violation and this, too, is the anthesis of fair play and a neutral, advisory role.

Of course, and to bring the argument around full circle, a defendant may wish to deny the allegation and to foreswear a resolution by guilty plea, if he or she is timely made aware of any discovery in Probation's

possession. By waiting to amend the Revocation Petition until after the guilty plea, Probation may increase the likelihood of the plea and in turn, make it all but certain that the defendant will admit the Grade A violation. This would undermine the criminal justice system's paramount goals of truth-seeking and accuracy.

Plainly, none of these arguments apply if Probation first becomes aware of facts in support of a new-criminal-activity allegation after the plea agreement. A post-plea allegation of new criminal activity is not *per se* problematic. But for all of the foregoing reasons, a post-plea allegation of new criminal activity is problematic when Probation cannot show just cause as to why the new-crimes allegation was not made before the plea.

Probation cannot make that showing here. Probation knew for over two years that the FBI suspected Don of robbing a bank. Probation knew for years before it filed the Amended Revocation Petition that Don had been indicted for bank robbery. Probation can offer no legitimate excuse as to why the new-crime allegation was not made until after Don pleaded guilty. Nor can it plausibly argue that Don is not prejudiced by the amendment.

Before the amendment, Don was facing three Grade C violations. With a criminal history score of IV, the presumptive Guidelines range was 6-12 months' prison. Now, because of the amendment, Don is facing a Grade A violation, and a presumptive Guidelines range of 24-30 months' prison. Don additionally believes that Probation will argue that any revocation sentence should run consecutively to the sentence on the bank robbery and weapons possession charges. The remedy is either for Probation on its own to strike the new-crimes allegation or for this Court to disregard it as a basis for revocation and sentencing.

But if it is to be considered, and the timing of the amendment is not offensive as a matter of law, then this Court should impose a concurrent revocation sentence. Don turns to that next and in doing so, explains why consideration of all the § 3553(a) factors support an aggregate carceral term of no more than 15 years.

### E.   An aggregate sentence of no more than 15 years prison is sufficient, but not greater than necessary, punishment.

Even accounting for earned time, a 15-year prison sentence is lengthy. It sends the clear message that society does not condone Don's behavior and it adequately reflects the recidivist nature of his crimes. An aggregate carceral term of 15 years will acknowledge the very real pain

that Don has caused the bank teller, the bank, and the public generally. In that regard, a 15-year prison sentence is not materially different than a lengthier sentence.  Don needs to be – and will be – punished for his behavior, but the degree of that punishment will not salve the harm he has caused others.

Yes, Don's new criminal activity occurred while he was on supervised release and so an argument for progressive punishment has superficial appeal.   Except that for one thing, the Sentencing Commission's own research suggests that the length of a sentence beyond one year has no impact on rearrest rates, *see supra*.  For another, the notion of progressive punishment rests on the assumption that new criminal activity is the product of rational thought – *i.e.* the defendant has rejected supervision and consciously abused the privileges it grants. In Don's case, he told his Probation Officer that he was suicidal days before the bank robbery and he was rebuffed.  Don's decision to rob the bank had nothing to do with his callous disregard of supervision; it had everything to do with his chemical dependency on drugs and his – at that time – very real mental health crisis, both of which evince anything but clear thinking.

Because of Don's advanced age, it is imperative that he is released from prison with sufficient time to reestablish a support system that can help him through the twilight years of inevitable declining health and mental acuity.  Don has the capacity and the desire to work and support himself, but as a manual laborer, his ability to do so will diminish the more his release date is extended and his age advances.  The longer Don stays in prison, the greater the likelihood that upon release, he will require even more taxpayer support to function day to day.

Don knows that he will receive a lengthy prison sentence, and candidly, that makes it difficult to formulate any sort of concrete release plan.  But Don knows that to be successful, he will need to obtain health care and stable housing.  He wants extensive therapy.  Don is an avid reader, a news junky, and he loves to fish.  He wants to know what it is to live a peaceful life.

Respectfully submitted,
DONALD TURNER
By his counsel,

Service to AUSA                 /s/ Jamesa J. Drake
and Probation                   Jamesa J. Drake
via CM/ECF                      Drake Law LLC
                                P.O. Box 56
                                Auburn, ME 04212
                                (207) 330-5105